**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

NATALIA ANTONIO, as Personal Representative
to the Estate of RUBEN TOLEDO, deceased,

      Plaintiff,

v.                                      No. 1:19-cv-00572 SCY/JFR

BOARD OF COUNTY COMISSIONERS FOR
THE COUNTY OF CIBOLA, ADRIANNE JARAMILLO,
LISA BURNSIDE, MICHAEL HILDENBRANT,
and MICHELLE LUCERO,

      Defendants.

**AMENDED COMPLAINT FOR THE RECOVERY OF DAMAGES CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS AND WRONGFUL DEATH**

Plaintiff brings this complaint for damages caused by the violation of his civil and constitutional rights. Plaintiff files this complaint under the Federal Civil Rights Act, and the Constitution of the United States. Plaintiff also brings claims under the New Mexico Tort Claims Act and Wrongful Death Act. In support of this Complaint, Plaintiff alleges the following:

**JURISDICTION AND VENUE**

1. Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988.

2. Venue is proper as the acts complained of occurred exclusively within Cibola County, New Mexico.

**PARTIES**

3. Plaintiff Natalia Antonio, as Personal Representative to the Estate of Ruben Toledo is an individual and resident of Bernalillo County, New Mexico. Mr. Toldeo was an inmate in the custody and care of the Cibola County Detention Center (hereinafter "CCDC") from

1

June 21, 2017 to June 25, 2017. While incarcerated, Mr. Toldeo was completely dependent upon CCDC for his care and well-being.

4. Natalia Antonio was appointed Personal Representative pursuant to the New Mexico Wrongful Death Act on June 24, 2019 in the Second Judicial District Court; D-202-2019-04063.

5. Defendant Board of County Commissioners for the County of Cibola ("Board") is a governmental entity within the State of New Mexico and a "person" under 43 U.S.C. § 1983. At all times material to this Complaint the Board was the employer of the individual defendants.

6. At all material times, Defendant Adrianne Jaramillo was employed by CCDC as the facility detention administrator with supervisory duties.

7. Defendant Jaramillo was acting under the color of state law and within the scope of her employment at all material times.

8. Defendant Jaramillo is being sued in her official capacity only.

9. At all material times, Defendant Lisa Burnside was employed by CCDC as a sergeant with supervisory duties.

10. Defendant Burnside was acting under the color of state law and within the scope of her employment at all material times.

11. Defendant Burnside is being sued in her individual capacity only.

12. At all material times, Defendant Michael Hildenbrant was a nurse employed by CCDC as the facility's health services administrator (HSA).

13. Defendant Hildenbrant was acting under the color of state law and within the scope of his employment at all material times.

14. Defendant Hildenbrant is being sued in his individual capacity only.

15. At all material times, Defendant Michelle Lucero was employed by CCDC.

16. Defendant Lucero was acting under the color of state law and within the scope of her employment at all material times.

17. Defendant Lucero is being sued in her individual capacity only.

## FACTUAL BACKGROUND

18. On Tuesday, June 20, 2017, Mr. Toledo was stopped by a U.S. Park Ranger at Petroglyph National Park.

19. Ruben Toledo was drinking at the park and appeared to be intoxicated.

20. Ruben was arrested for suspicion of operating a motor vehicle while intoxicated.

21. When Ruben was arrested, his blood alcohol content (BAC) was measured by U.S. Park Ranger Steven Powers to be 0.27.

22. Ruben was then transported to the Sandoval County Detention Center, then quickly transferred to the Cibola County Detention Center (CCDC) in Grants, New Mexico on Wednesday, June 21, 2017.

23. Ruben was a pretrial detainee throughout his time at CCDC.

24. When Ruben arrived at the facility, he told staff he suffered from depression and anxiety, and staff noted that he was chemically impaired.

25. Mr. Toledo admitted to drinking the day prior to being booked into the jail.

26. Mr. Toledo had his vital signs taken upon booking and results were abnormal.

27. Ruben's blood pressure was 169/94, his pulse was 100 beats per minute, and had a glucose level of 161.

28. Despite his abnormal vitals and an understanding that Mr. Toledo was intoxicated when he was booked, jail staff cleared him for housing in general population.

29. Ruben remained in general population without treatment or observation by medical staff for two days.

30. Without observation or treatment, Mr. Toledo began to suffer from alcohol withdrawal.

31. Mr. Toledo asked to be moved out of general population because he feared he was in danger of bodily harm by other inmates if he remained.

32. Ruben had begun seeing things in his cell, a symptom of severe alcohol withdrawal.

33. Finally, on June 23, 2017 Ruben was seen by Defendant Michelle Lucero, a physician's assistant at the jail.

34. Mr. Toledo reported daily alcohol use of beer and hard liquor prior to being booked into the jail.

35. Defendant Lucero noted Ruben's blood pressure and pulse were still elevated; both additional signs of alcohol of withdrawal.

36. Defendant Lucero noted that Mr. Toledo was a "difficult historian" with a "poor memory" and that he had a knowledge deficit.

37. Despite obvious signs and symptoms of alcohol withdrawal, Defendant Lucero failed to provide any treatment for his withdrawal.

38. Instead, Defendant Lucero ordered Mr. Toledo be given Lisinopril, a blood pressure medication, and Metformin, a medication used to treat diabetes.

39. Ruben was sent back to his cell with no further care or monitoring ordered.

40. Later that day, Mr. Toledo called master control screaming to be let out of his cell.

41. Ruben had been hallucinating as a result of his severe alcohol withdrawal.

42. When officers arrived at his cell and opened the door, Mr. Toledo ran in an attempt to get out of the cell.

43. As he ran, officers maced Ruben, then handcuffed him.

44. Officers determined Ruben would be moved from general population and escorted him to medical so he could be cleared for housing in segregation.

45. Ruben was moved to segregation as punishment for his symptoms of alcohol withdrawal.

46. When he arrived, Ruben told medical staff that he was experiencing alcohol withdrawal and was hallucinating.

47. Medical staff contacted Defendant Hildenbrant for instruction.

48. Defendant Hildenbrant was not at the facility.

49. Defendant Hildenbrant is a nurse without prescribing authority.

50. Defendant Hildenbrant directed staff to place Ruben on alcohol withdrawal protocol, including prescription medication, over the phone.

51. Defendant Hildenbrant did not go to the facility or attempt to see Ruben before prescribing this medication.

52. When this medication was prescribed, Ruben's vitals were still abnormal, with a blood pressure of 179/100 and a pulse of 120 beats per minute.

53. Until this point, Ruben had not been monitored for his withdrawal.

54. In light of his severe symptoms of withdrawal, Ruben should have been hospitalized.

55. Instead, Ruben was sent to segregation.

56. During his time in segregation, Ruben was observed periodically by jail guards.

57. Ruben was not monitored by medical staff.

58. Throughout that night, Ruben began exhibiting strange behavior.

59. Jail staff reported Ruben was "acting strange," was weeping in his cell, and had wrapped himself in toilet paper.

60. Jail staff also reported Ruben was chanting something in his cell.

61. Despite this, Ruben received no medical attention in response to his erratic behavior.

62. Later that evening, a medical assistant, Rayleen Ray, went to Ruben's cell to give him his medication.

63. When she arrived to his cell, Ruben had moved his mattress onto the floor of his cell and was laying down on the ground.

64. Initially, Ruben refused to take his medication.

65. Eventually, Ruben agreed to take his medication only if he could take it standing up.

66. Unfortunately, Ruben's condition had become so severe he was unable to stand on his own, so jail guards had to assist him to his feet.

67. Ruben still was not provided any medical care related to his erratic behavior earlier that day, or for his inability to stand.

68. A couple of hours later, Ms. Ray returned to check on Ruben.

69. Ms. Ray looked at Ruben through his food port but conducted no medical evaluation.

70. Ms. Ray then asked the segregation officer to keep watch and "if anything [was] not looking good to his opinion to call and [she would] come and check on his well being again."

71. Upon information and belief, medical was not contacted again.

72. The following morning, Ruben suffered an alcohol induced seizure.

73. Defendant Burnside was called to Ruben's solitary cell, who observed him through his food port laying on the floor seizing.

74. Ruben's cell door was opened and officers entered.

75. Once Ruben stopped seizing, Defendant Burnside asked him if he was ok.

76. Ruben looked up at her but could not speak.

77. Defendant Burnside then noticed dried blood on Ruben's forehead.

78. It was apparent that Ruben had suffered a head injury in his cell, presumably while seizing alone in his solitary cell.

79. Rather than call 911, Defendant Burnside directed officers to take Ruben to the shower to clean up.

80. In the meantime, Defendant Burnside went to find Ruben a new isolation cell to be housed in.

81. Defendants did not contact medical staff or 911.

82. Because he could not walk on his own, officers carried Ruben to the shower.

83. When officers got him to the shower, Ruben was unable to stand on his own, so he was placed on the ground.

84. Ruben slumped over on the ground and became unresponsive.

85. Officers still failed to contact facility medical staff or emergency medical services.

86. Instead of immediately calling 911, officers tried to lift Ruben onto a chair.

87. Officers eventually called facility medical staff for help.

88. When they arrived, medical staff directed officers to call 911 and begin CPR.

89. Emergency medical staff arrived and transported Ruben to the Cibola General Hospital.

90. When Ruben arrived at the hospital, he remained unresponsive.

91. Ruben's blood pressure was 86/47 and his heart rate was 115 beats per minute.

92. Medical staff conducted blood work which revealed his sodium levels were critically high, and his carbon dioxide levels were critically low.

93. Medical staff also noted Ruben suffered significant bruising

94. Ruben had become was so severely dehydrated that medical staff noted that his urine was purulent and amber in color.

95. Medical staff at the Cibola General Hospital recognized they were unable to treat Ruben because his condition was so severe.

96. Ruben was quickly transferred to the University of New Mexico Hospital.

97. After Ruben left the jail, he never regained consciousness.

98. Ruben remained on life support through July 1, 2017.

99. Soon after he was removed from life support, Ruben was pronounced dead.

100. Approximately three weeks after Ruben's death, the county announced it would be closing CCDC.

### COUNT I: VIOLATION OF DUE PROCESS
### INADEQUATE MEDICAL CARE
### (Defendants Michelle Lucero, Lisa Burnside, Michael Hildenbrant)

101. Plaintiff restates each of the preceding allegations as if fully stated herein.

102. Plaintiff has a Fourteenth Amendment right to humane conditions of confinement and adequate medical care.

103. When he arrived at CCDC, defendants knew Ruben had consumed alcoholic beverages before entering the jail.

104. In fact, Ruben told jail staff that he had consumed alcoholic beverages.

105. Defendant Lucero in fact noted that Ruben was "chemically impaired" during his time at the jail.

106. It was obvious that Ruben was suffering from alcohol withdrawal when he entered the jail.

107. Ruben's symptoms of withdrawal were so obvious that Ruben told jail staff that he was withdrawing.

108. Defendants knew alcohol withdrawal is an extremely common and predictable event in a jail setting.

109. Defendants knew alcohol withdrawal is a dangerous and life-threatening medical condition.

110. Because of its severity, individuals experiencing alcohol withdrawal need constant monitoring of their symptoms, water and food intake, and vitals.

111. Defendants failed to adequately monitor Ruben while he experienced withdrawal.

112. Eventually, Ruben's symptoms became so severe that he began hallucinating.

113. When Ruben began experiencing hallucination, he should have been transferred to a hospital setting.

114. Instead, Defendants placed Ruben in a solitary cell and allowed him to continue suffering untreated from severe withdrawals.

115. Defendants knew that alcohol withdrawal is likely to lead to death if left untreated and unmonitored.

116. The only care Ruben received was a daily dosage of Librium after he began experiencing hallucinations.

117. Defendant Hildenbrant prescribed Librium and Clonidine over the phone without evaluating Ruben and without prescribing authority.

118. Defendant Hildenbrant knew he did not have the legal authority to prescribe medication.

119. Defendant Hildenbrant knew it was dangerous to prescribe any medication without evaluating a patient.

120. Because Ruben's condition had deteriorated to such a severe degree, prescription of Librium at this point amounted to no care at all.

121. As Ruben's symptoms worsened, Defendants continued to refuse to provide him medical care.

122. Defendants watched Ruben deteriorate day after day.

123. In fact, Defendants recognized Ruben's condition was getting worse each day but decided to hold off contacting medical for evaluation.

124. Defendants Lucero and Hildenbrant had a duty to monitor Ruben's condition rather than rely on untrained guards.

125. Defendants Lucero and Hildenbrant nevertheless failed to monitor Ruben's medical condition.

126. As a result of defendants' deliberate procrastination, Ruben's condition became so severe he suffered an alcohol induced seizure, during which he suffered a head injury.

127. Defendants still refused to obtain medical care for Ruben.

128. It is well-known that standard treatment protocols require immediate intervention when someone experiencing alcohol withdrawal has a seizure.

129. Common sense dictates the need for immediate emergency medical care when any person experiences a seizure or head trauma.

130. Instead, Defendant Burnside decided to carry Ruben to the shower to "clean up."

131. Common symptoms of alcohol withdrawal include sweating, nausea, vomiting, and diarrhea.

132. As a result of these symptoms, Ruben was allowed to dehydrate to an unacceptable level.

133. As a result of these symptoms, Ruben was taken to the shower to "clean up" after expelling some form of bodily fluid.

134. As a result of these symptoms, the cell Ruben had been housed in was no longer appropriate for habitation.

135. Instead of calling medical staff or 911, Defendant Burnside searched for a new solitary cell to rehouse Ruben after his seizure.

136. Ruben needed a hospital, not a new cell.

137. It was obvious to Defendants that Ruben was experiencing a medical emergency.

138. Seizures, head injuries, and alcohol withdrawal individually are all serious, obvious medical conditions requiring emergent medical care.

139. Defendants knew they were incapable of providing adequate medical care at CCDC.

140. Defendants failed to obtain medical care until Ruben was slumped over and unresponsive.

141. Ruben never regained consciousness after this.

142. If Ruben would have received medical attention when he began experiencing symptoms of withdrawal, Ruben would have survived.

143. As a proximate and foreseeable result of Defendants' deliberate indifference to Mr. Toledo's serious, obvious medical condition, Plaintiff suffered injuries including pain and suffering, emotional distress, exacerbation of his mental illness, and subsequent death.

## COUNT II & III: NEGLIGENT MAINTENANCE OF A MEDICAL FACILITY AND NEGLIGENT PROVISION OF MEDICAL CARE
### (Defendants Board of County Commissioners for the County of Cibola, <u>Michelle Lucero, Lisa Burnside, Michael Hildenbrant</u>)

144.    Plaintiff restates each of the preceding allegations as if fully stated herein.

145.    Defendants had a duty to ensure Ruben received adequate care while housed at CCDC.

146.    Defendants were exclusively in charge of the medical care all inmates at CCDC, including Ruben, received while they were under their custody.

147.    Defendants had a duty to properly operate and maintain this medical facility to ensure inmates receive adequate medical care.

148.    Defendants routinely provided substandard care, or no care at all, to inmates in their facility.

149.    Upon information and belief, Defendants do not transport inmates to the emergency room to avoid costs of treatment.

150.    Defendants used a nurse without prescribing authority to prescribe medications to inmates at CCDC.

151.    Defendants used a nurse to make decisions on inmate medical care and treatment remotely without going to the jail to monitor or evaluate patients.

152.    This routine of providing substandard care has been demonstrated by Defendants in the past.

153.    In 2016, Douglas Edmisten died at CCDC following a refusal by facility staff, including Defendant Hildenbrant, to transport Edmisten to the hospital.

154.    Douglas Edmisten had been vomiting and defecating blood for hours while inmates pleaded with facility staff for medical attention.

155. Despite suffering from an emergent medical condition, Defendant Hildenbrant and then-director Michael Dodds ordered staff not transport Mr. Edmisten to the emergency room.

156. Mr. Edmisten died in the earlier hours of the morning, approximately 7 hours after first requesting help for his serious condition.

157. During his time at CCDC, Ruben was suffering from alcohol withdrawal.

158. Defendants knew Ruben was suffering from alcohol withdrawal.

159. Alcohol withdrawal is a predictable event in a jail.

160. Defendants knew alcohol withdrawal is a dangerous and life-threatening medical condition.

161. Defendants Hildenbrant and Lucero had a duty to ensure Ruben was monitored by trained medical staff during his withdrawal.

162. Defendants knew they should have monitored Ruben's food and water intake during his withdrawal.

163. Defendants knew Ruben should have been monitored for signs and symptoms of severe withdrawal.

164. Defendants knew that they were unable to treat patients suffering from severe alcohol withdrawal.

165. Defendants knew that once his withdrawal became severe, he needed to be transported to a hospital.

166. Ruben began exhibiting the symptoms of severe alcohol withdrawal, including hallucinations and seizures.

167. The standard of care required transport to a hospital once he began exhibiting these symptoms.

168. A reasonable healthcare provider would have adhered to the medical standard of care.

169. A reasonable healthcare provider would have ensured Ruben was monitored for decompensation.

170. A reasonable healthcare provider would have transported Ruben to a hospital the moment he began exhibiting symptoms of severe alcohol withdrawal.

171. Defendant Board employs medical staff at CCDC.

172. Defendant Board is vicariously liable for the acts and omissions of its employees by respondeat superior.

173. Defendant Board had a duty to properly and adequately train its medical staff to respond properly to emergency situations.

174. Defendant Board had a duty to train its staff how to properly respond to alcohol withdrawal in a jail setting.

175. Defendants breached their duty of care.

176. Defendants' negligence deprived Ruben of a chance of survival.

177. Defendants' negligence was the proximate cause of this lost chance.

178. As a proximate and foreseeable result of Defendants' deliberate indifference to Mr. Toledo's serious, obvious medical condition, he suffered injuries including pain and suffering, emotional distress, exacerbation of his mental illness, and subsequent death.

**COUNT IV: CUSTOM AND POLICY OF VIOLATING CONSTITUTIONAL RIGHTS**
**(Defendant Adrianne Jaramillo)**

179. Plaintiffs restate each of the preceding allegations as if fully stated herein.

180. Defendant Board has delegated the responsibilities of running the CCDC to Defendant Adrianne Jaramillo.

181. Pursuant to state law, jail administrators acting in their official capacity are regarded as the final policy makers of their respective institutions.

182. Defendant Jaramillo was therefore the final policy maker responsible for the hiring training and supervision of CCDC employees during her tenure.

183. Defendants Jaramillo's policies therefore became the customs and policies of the County.

184. During her tenure and that of her predecessors, Defendant Jaramillo practiced a custom and policy of providing inadequate medical care to inmates at CCDC.

185. Not long before Ruben's death, another inmate at CCDC died as a result of staff refusal to provide medical care.

186. At the time of Mr. Edmisten's detention, Michael Dodds was the facility administrator of CCDC.

187. Douglas Edmisten was housed at CCDC in 2016, where he died of internal bleeding.

188. Mr. Edmisten and other inmates in the pod begged staff for medical attention, which was refused.

189. CCDC staff watched as Mr. Edmisten suffered in pain but refused to take him to see medical staff or to a hospital.

190. Michael Dodds ordered his staff not to call an ambulance for Mr. Edmisten.

191. Without medical care, Mr. Edmisten died at the facility.

192. Shortly after Mr. Edmisten's case settled, Defendant Jaramillo replaced Michael Dodds as the administrator of CCDC.

193. Defendant Jaramillo continued the practice as policies set in place by Michael Dodds.

194. The policies, customs, decisions, and practices of Defendant Jaramillo fostered a climate within CCDC where staff was unwilling to obtain medical care for inmates, even in the face of a clear medical emergency.

195. There is a causal connection between Defendant Jaramillo's policies and the violation of Ruben's constitutional rights, which amounts to deliberate indifference.

196. As a proximate and foreseeable result of Defendants' deliberate indifference to Mr. Toledo's serious, obvious medical condition, Plaintiff suffered injuries including pain and suffering, emotional distress, exacerbation of his mental illness, and subsequent death.

## JURY DEMAND

197. Plaintiffs hereby demand a trial by jury on all counts.

WHEREFORE, Plaintiffs requests judgment as follows:

1. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for attorney's fees and emotional harm.

2. Punitive damages in an as yet undetermined amount severally against the individually named Defendants.

3. Reasonable costs and attorney's fees incurred in bringing this action.

4. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

COYTE LAW P.C.

/s/ Alyssa D. Quijano
Alyssa D. Quijano
Matthew E. Coyte
Attorneys for Plaintiff
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 244-3030

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of June, 2019, I filed the foregoing electronically through the CM/ECF system, which caused Counsel of Record to be served by electronic means.

   /s/ Alyssa D. Quijano
Alyssa D. Quijano